UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEANA MARIE WALKER,

      Plaintiff,                       Civil Action No. 12-11175

v.                                     HON. JOHN CORBETT O'MEARA
                                     U.S. District Judge
                                     HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

    Plaintiff Deana Marie Walker brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Tr. 24). Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Doc. #16] be DENIED, and that Plaintiff's Motion for Summary Judgment [Doc. #11] be GRANTED to the extent that the case be remanded for further administrative proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

-1-

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on January 4, 2011, alleging disability as of October 1, 2007, (Tr. 148-150, Tr. 156-158). After the initial denial of benefits, Plaintiff requested an administrative hearing. (Tr. 32). The hearing was held in Mount Pleasant, Michigan on December 13, 2011, Administrative Law Judge ("ALJ") Tammy Thames presiding. (Tr. 33). At the hearing, Plaintiff, represented by attorney John Morosi, testified (Tr. 35-60, 62-66), as did Vocational Expert ("VE") Richard Riedl. (Tr. 66-72). On January 19, 2012, ALJ Thames found that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 24). On February 14, 2012 the Appeals Council denied review the ALJ's opinion. (Tr. 1-6). Plaintiff filed for judicial review on August 1, 2012.

## BACKGROUND FACTS

Plaintiff, born July 31, 1975, was 36 when the ALJ issued her decision (Tr. 74). She completed high school, and she previously worked as a dishwasher, a factory worker, a grocery clerk, and a fast-food worker. (Tr. 39, 61). Plaintiff alleges disability as a result of a herniated disc, a learning disability, bi-polar disorder, a pinched sciatic nerve, a heart murmur, tendinitis in the right wrist, and a bilateral knee impairment. (Tr. 102).

### A. Plaintiff's Testimony

Plaintiff testified that she currently stood 5'9 ½" and weighed 253 pounds. (Tr. 46-47). Plaintiff testified that she was currently living with a group of friends, but that she would like to eventually move back to her home county. (Tr. 38). She last worked in October 2007. (Tr. 38). She testified that she was receiving assistance from the State in the

form of food stamps, but she was not receiving any sort of medical assistance. (Tr. 38). Plaintiff lost her parental rights to a 14-year-old daughter and a one-year-old son. (Tr. 38).

Plaintiff's last job was as a dishwasher in October 2007. (Tr. 39). The dishwasher position was seasonal, and ended that fall. (Tr. 40). Prior to this, between 1998 and 2004, she used a temporary staffing agency to find employment in manufacturing, where she washed, inspected and assembled parts, ran a conveyor belt, and packaged and shipped the completed parts. (Tr. 39). After this, she held a position at a grocery store, bagging customers' groceries and stocking shelves. (Tr. 39). Plaintiff stated that she applied for a few positions after this, but because she was fearful for her own safety, she has not worked anywhere else or sought employment since October 2007. (Tr. 41-42).

Plaintiff testified that she received medication and counseling from Dr. Cherukuri in Midland, Michigan, Lisa Brown-Fagan in Flint, Michigan and Amaren Wolf. (Tr. 42). Plaintiff testified that she was not on medication, and that the last time she took medication was in May of the previous year. (Tr. 43). She stated that she took Zoloft, but that she could not recall any of her other previous medications. (Tr. 43).

Plaintiff testified that she had complications during her son's delivery that stemmed from a heart murmur, and that the hospital placed a heart monitor on her during her time in the hospital. (Tr. 43-45). However, the hospital did not express concern over the condition when she was discharged and did not order further monitoring of the heart condition. (Tr. 45). Plaintiff testified that throughout her pregnancy, she experienced problems with her knees and back, but that she was not sure whether those issues were attributable to the

pregnancy or another issue.  (Tr. 45-46).

Plaintiff stated that to manage her back pain, she would take over-the-counter pain relievers, and that when she went to the emergency room, the treating physician would not prescribe any other pain reliever because she did not have health insurance.  (Tr. 48-49).  Plaintiff testified that she experienced numbness in her lower extremities and problems moving or sitting due to her back problems.  (Tr. 48).  Plaintiff testified that she was diagnosed with a bi-polar disorder in October 2007, but was not given any medication and was not referred to any inpatient or outpatient treatment.  (Tr. 50).  She also reported that she has sought help with anger management and her psychological issues, but that the State has refused to provide any assistance.  (Tr. 51).

Plaintiff stated that she was currently living with a group of friends she met through a friend at a shelter, and that she has grown attached to her roommates' children.  (Tr. 51).  She said that the shelter offered assistance to finding suitable housing, but that she refused because she did not want to be "served something like that on a platter."  (Tr. 52).  Plaintiff reported that she has been able to get along with the people she has been living with.  (Tr. 53).

In response to questioning by her attorney, Plaintiff said that the hallucinations began in 2009, and were mainly of deceased relatives.  (Tr. 54-55).  When her attorney asked her about her alleged issues dealing with people, Plaintiff stated that she will walk away from a situation to avoid conflict and, if she is unable to walk away, she will bite her tongue and try to think about something else.  (Tr. 58).   She stated that she had been sexually abused

-4-

at the age of 6 or 7 by a family member, and that she had been raped by a friend of her father at the age of 16 or 17.  (Tr. 59).

**B.    Medical Evicdence[1]**

### 1. Treating Sources

In July 2009, Plaintiff began receiving counseling services from Catholic Charities in Flint, MI.  Counselor Lisa Brown-Fagan assigned a Global Assessment of Functioning (GAF) score of 45[2], and noted that Plaintiff complained about hallucinations, both auditory and visual, but that the hallucinations were not commanding.  (Tr. 325).  Counselor Brown-Fagan noted suicidal ideations, but did not feel Plaintiff posed a threat to herself or others. (Tr. 326).

In September 2009, Dr. Spencer Ballard, D.O., of Catholic Charities noted that Plaintiff was still complaining of auditory hallucinations.  Dr. Ballard described Plaintiff's attitude and behavior as cooperative and that she was able to relate fairly well.  (Tr. 308) Dr. Ballard noted, however, that Plaintiff displayed limited insight and that her judgment was limited.  (Tr. 309).  The doctor prescribed Zoloft as a mood stabilizer, and Trilafon as a psychostimulant.  (Tr. 319).  In October of 2009, Plaintiff reported that she was still feeling

---

[1]  Records pertaining to conditions unrelated to the disability claim have been reviewed in full but are omitted from discussion.

[2]  A GAF score of 41-50 indicates "[s]ymptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. AmericanPsychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR*)(4th ed. 2000).

depressed and experiencing auditory hallucinations. (Tr. 316). The Termination Summary from Catholic Charities indicates that Plaintiff was last seen on January 27, 2010. (Tr. 299).

In July 2010, Plaintiff was admitted to Valley Medical Center complaining of fatigue, shortness of breath with exertion and other symptoms. (Tr. 271). Plaintiff was examined by Dr. John L. Stoker Jr., D.O. Dr. Stoker noted that Plaintiff denied any musculoskeletal restriction, or joint swelling or restrictions in her extremities. (Tr. 271). Additionally, he noted that Plaintiff's heart rate and rhythm were regular, and he did not detect a murmur. (Tr. 272). Dr. Stoker detected no difficulty in Plaintiff's ability to walk or stand, and Plaintiff showed normal range of motion in her musculoskeletal system. (Tr. 273-274). Dr. Stoker examined Plaintiff again in September 2010 and, aside from Plaintiff's complaint about pain in her sacrum and coccyx stemming from a recent fall, the doctor noted no changes in Plaintiff's heart rate and rhythm or Plaintiff's musculoskeletal system. (Tr. 267-269).

Plaintiff was then seen by Community Mental Health for Central Michigan in December 2010 for severe anxiety, causing sleep issues, and severe depression, including suicidal ideation. (Tr. 364). Plaintiff stated that she had previously attempted suicide in 2004 after her mother died. (Tr. 366). Plaintiff was diagnosed with major depressive disorder without psychotic features, and was assigned a GAF score of 48. (Tr. 372).

In April 2011, Plaintiff was seen by psychiatrist Dr. Suma Cherukuri. (Tr. 388). Plaintiff testified that she went to the emergency room three weeks prior as a result of suicidal thoughts that occured while drinking, but that she was not admitted. (Tr. 390). Dr.

-6-

Cherukuri noted that while Plaintiff claimed to hear voices and see things that other people did not hear or see, these experiences did not appear to be true auditory or visual hallucinations, but rather secondary to grief or loss. (Tr. 391). Dr. Cherukuri also noted that Plaintiff's memory appeared to be good, and that she did not display any impulsivity or distractibility. (Tr. 391). The doctor did note, however, that Plaintiff had difficulty with simple subtraction. (Tr. 391). Plaintiff was assigned a GAF score of 45-50. (Tr. 392).

## 2. Non-Treating Sources

In March, 2011, Janette S. Caputo, Ph.D. conducted a psychiatric consultative examination of Plaintiff on behalf of the Social Security Administration (SSA). (Tr. 350-356). Caputo recorded that Plaintiff's interests included coloring, hooked rugs, riding horses, watching television and movies, walking on the beach, cooking, and reading. (Tr. 353). Caputo reported that Plaintiff exhibited socially appropriate behavior throughout the exam, and that she put reasonable effort into all activities in the mental status portion of the examination. *Id*. Caputo stated that Plaintiff's conversation was logical, coherent, simple and concrete, although her chronology was often difficult to follow. *Id*. Caputo noted that Plaintiff's capacity for insight and problem solving appeared to be intact, and that her judgment appeared to be adequate. *Id*. Caputo noted that while she had thoughts of self-harm, Plaintiff indicated that she was able to overcome them by keeping her focus on her children. (Tr. 353-354). Plaintiff was assigned a GAF score of 51.[3] Caputo found that

---

[3] A GAF score of 51-60 indicates moderate symptoms (occassional panic attacks) or moderate difficulty in social, occupation, or school functioning. American Psychiatric

Plaintiff was able to understand simple and some moderately complex instructions, and that she could acquire new learning at a level that would serve for basic employment. (Tr. 356). She found that Plaintiff was able to complete routine tasks, but noted that Plaintiff's emotional cycling could compromise that ability. *Id*.

Dr. Caputo's notes indicate that Plaintiff's judgment, decision-making, and problem skills were adequate only for closely-supervised employment. *Id*. Caputo noted that Plaintiff's interaction with others is expected to be highly conflictual and volatile, with rapid-mood swings, poor anger management skills, and subsequent depression and remorse. *Id*. Finally, Caputo noted that while she felt Plaintiff is capable of obtaining work, she would have difficulty staying employed for any significant period of time. *Id*.

In March, 2011, Wayne Hill, Ph.D. conducted a Psychiatric Review Technique assessment, finding the presence of affective disorders, a learning disorder, and borderline intellectual functioning. (Tr. 79, 92). Hill found a mild impairment in activities of daily living and social functioning, a moderate impairment in maintaining concentration, persistence, and pace, but no episodes of decompensation. (Tr. 80, 93).

Dr. Hill also conducted a Mental Residual Functioning Capacity assessment. (Tr. 96-98). Hill found that Plaintiff was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being

---

Association. *Diagnostic and Statistical Manual of Mental Disorders–Text Revision* at 34 (*DSM-IV-TR*)(4th ed. 2000).

punctual within customary tolerances; sustaining an ordinary routine without special supervision; making simple work-related decisions; completing a workday or workweek without psychologically based symptoms and interruptions; responding to workplace changes; being aware of workplace hazards; and setting realistic goals or making plans for herself.   (Tr. 83-84, 96-97).   Hill concluded that Plaintiff was capable of learning, remembering, understanding, and performing simple one and two-step tasks on a sustained basis. (Tr. 85, 98).

In June, 2011, Dustin Gillispie, S.D.M. conducted a Phsyical Residual Functioning Capacity assessment on behalf of the SSA, finding that Plaintiff was capable of lifting 20 pounds occasionally, and 10 pounds frequently; standing, sitting, and walking for six hours in an eight-hour workday; and pushing and pulling without limits.  (Tr. 81, 94).  Gillispie found frequent postural limitations in climbing ramps and stairs, stooping (i.e. bending at the waist), kneeling, and crouching (i.e. bending at the knee).  He found occasional limitations with climbing ladders, ropes and scaffolds, and crouching.  (Tr. 82, 95)  Gillispie found that Plaintiff must avoid concentrated exposure to extreme cold, and must avoid concentrated exposure to workplace hazards (i.e. machinery, heights, etc.).  (Tr. 82-83, 95-96).   Gillispie noted that Plaintiff's statements regarding her physical condition were only entitled to partial credibility.  (Tr. 81,94).  He noted that Plaintiff did not express a dislike of being around others to the Consultative Examination examiner, Caputo, and that Plaintiff did not appear to have any deficits related to her alleged psychological impairments. (Tr. 81, 94). Gillispie gave "great weight" to Caputo's medical opinion because "it is generally consistent with

[claimant's] function." (Tr. 81, 94).  Gillispie conclude that while she was unable to perform previous work, Plaintiff was able to perform work that was less demanding.  (Tr. 86, 99).

In May, 2011, Dr. Richard C. Gause, M.D. performed a physical consultative examination on behalf of the SSA. (Tr. 358-363).  Dr. Gause noted that Plaintiff's herniated disc was caused by a wrestling incident 10 years prior.  (Tr. 360).  Dr. Gause noted that Plaintiff claimed an inability to walk or stand for more than 5-10 minutes at a time because of pain, but that she was not currently taking any medication for pain or as an anti-inflammatory.  (Tr.  360).  Dr. Gause described Plaintiff's immediate, recent and remote memory as intact with normal concentration, with appropriate insight and judgment.  (Tr. 361).  Regarding Plaintiff's musculoskeletal system, Dr. Gause noted that there was no evidence of joint laxity, crepitance, or effusion, and that Plaintiff was able to get on to and off of the examination table without assistance.  (Tr. 361).  Also, Plaintiff had no difficulty squatting heel and toe walking, or hopping.  (Tr. 361).    Dr. Gause noted that range of motion in all joints is full except in the dorsolumbar spine.  (Tr. 361).  The doctor concluded that the numbness and pain, which radiated to the toes on the left was attributable to the sciatica.  (Tr. 362).

## C.    Vocational Expert Testimony

VE Richard Riedl classified Plaintiff's former work as a bagger stock clerk as light/unskilled work; dishwasher, light/unskilled work; fast-food worker, light/unskilled work; equipment cleaner, light/unskilled work; factory worker, light/unskilled work; and as

a deli-worker, light/unskilled work.[4]  (Tr. 66-68).

The ALJ then posed the following hypothetical question:

The first question, I'd like for you to assume an individual of the claimant's age, education and past work experience with the following limitations: occasionally, lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds. Stand and/or walk with normal breaks a total of about six in an eight-hour workday.  Sit with normal breaks a total of about six hours in an eight-hour workday.  Frequently perform climbing of stairs, occasionally climbing ladders, ropes of scaffolds, frequently balancing, stooping, kneeling, crouching; occasionally crawling. Avoiding concentrated exposure to hazards such as machinery, heights, having the ability to understand, remember and carry out simple instructions and perform simple tasks.  Work that does not involve computation or calculation, and no more than occasional interaction with the public or coworkers.  Would an individual with these limitation be capable of performing any of the claimant's last jobs?

(Tr.68-69).

The VE responded that the Plaintiff would not be able to return to her equipment-moving job.  Additionally, she would be unable to return to her work as a grocery clerk/bagger and her work in a deli restaurant would be eliminated due to "frequent contact with the public."  However, he stated that Plaintiff would be able to return to her past work as an equipment cleaner, dishwasher, and fast-food worker.  (Tr. 69).

The VE testified that the above limitations did not prevent Plaintiff from performing

---

⁴  20 C.F.R. §404.1567 (a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;" *light* work as "lifting no more and 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involved lifting no more than 100 pounds at a time with frequent lifting of objects weighing up to 50 pounds.

factory-type positions (VE did not include the number of jobs in the regional economy); third-shift office cleaner (6,000 jobs in the regional economy); unskilled production inspection (5,400); and light packaging job (6,500). (Tr. 70-71).

> The ALJ the posed a second hypothetical question to the VE:
>
> And for the next hypothetical, I'd like you to assume an individual of the claimant's age, education, and past work experience with the same physical limitations as previously described in the first hypothetical, however, with the following non-exertional limitations. Not able to, on a regular and sustained basis, understand, remember and carry out very short and simple instructions, not able to maintain regular attendance and be punctual, not able to sustain an ordinary routine without special supervision on a frequent basis. Unable to work in coordination with or close proximity to others. Essentially, no interaction with the public or coworkers, and unable to, on a regular basis, make simple work-related decisions. Would an individual with these limitations be capable of performing any of the claimant's past work?

(Tr. 71). The VE responded that employment would be precluded based on these limitations. (Tr. 71).

Plaintiff's attorney then asked whether, "due to a combination of psychological or psychiatric impairments, which would include panic disorder, chronic anxiety, auditory and visual hallucinations, an individual [who] would be expected to be absent from work two or more times per month without prior arrangements," Plaintiff would be precluded from all types of employment. (Tr. 72). The VE responded that a person affected with these impairments would be precluded from all types of employment. (Tr. 72). The VE agreed that his testimony was consistent with the descriptions and definitions provided for in the *Dictionary of Occupational Titles*. (Tr. 71-72).

**D.    The ALJ's Decision**

Citing Plaintiff's medical records, ALJ Thames found the severe impairments of "history of lumbar herniated disc with left-sided sciatica; history of right wrist tendonitis (*sic*); history of right knee degenerative joint disease; bi-polar disorder; (and) depression." (Tr. 14).  However, the ALJ found that none of the conditions met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 15).  The ALJ rejected the Plaintiff's claim that her alleged heart murmur, obesity, and alleged learning disability constituted a severe impairment.   The ALJ found that Plaintiff had moderate difficulties with concentration, persistence, and pace.  (Tr. 17).

She determined that Plaintiff retained the Residual Functional Capacity ("RFC") to perform light work, except that Plaintiff could "frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds." (Tr. 18).  She also found that Plaintiff "can frequently balance, stoop, kneel, or crouch, and occasionally crawl."  (Tr. 18).  The ALJ found that Plaintiff "should avoid concentrated exposure to extreme cold and hazards, such as unexpected heights and dangerous moving machinery."  (Tr. 18).  She also found that Plaintiff retained "the ability to understand, remember, and carry out simple instructions and perform simple tasks," and that Plaintiff could "perform work that does not involve computation or calculation, and that involves no more than occasional interaction with the public or co-workers."  (Tr. 18).  The ALJ found that Plaintiff could return to her past work as a dishwasher, fast-food worker, and equipment cleaner.  (Tr. 22).  She also found that Plaintiff could perform work in the national economy as an office cleaner, production

inspector, and packager.  (Tr. 23).

The ALJ determined that the Plaintiff's claim regarding the intensity, persistence and limiting effects of the symptoms associated with her impairments were "not credible to the extent they are inconsistent with the [] residual capacity assessment."  (Tr. 18).  The ALJ noted that there was a total lack of medical evidence to substantiate Plaintiff's claims of debilitating pain, highlighting the lack of prescription pain medication and the fact that Plaintiff still performed all household chores and self-care and Plaintiff's hobbies.  (Tr. 19). Regarding Plaintiff's mental health claims, the ALJ found that Plaintiff's "lack of consistent treatment weighs against her credibility, particularly in light of the fact that she has never been admitted for inpatient psychiatric care and evaluation.  Additionally, the observations of the claimant's treating and examining health professionals are not consistent with limitations beyond those in the [RFC]."  (Tr. 20).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. § 405(g); *Sherrill v. Secretary of Health and Human Services*, 757 F.2d 803, 806 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. V. NLRB*, 305 U.S. 197, 229, S.Ct. 206, 83 L.Ed. 126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way,

-14-

without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death of which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. § 416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health and Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

## ANALYSIS

### A.  The Hypothetical Question

Plaintiff's Argument A and Argument G both concern alleged defects in the ALJ's hypothetical question to the VE, and will be discussed together.  *Plaintiff's Brief* at 12, 21.  She essentially restates the same argument in Argument A; thus, these claims will be discussed in tandem.  Here, Plaintiff argues that the limitations given in the hypothetical question do not account for her moderate limitations in concentration, persistence or pace ("CPP").  *Plaintiff's Brief* at 12-13.  Relying upon *Edwards v. Barnhart*, 383 F.Supp.2d 920 (E.D.Mich. 2005), She contends that the hypothetical question's restriction of "simple instructions and tasks without computation" was insufficient and did not fully address her moderate deficiencies in CPP.  *Plaintiff's Brief* at 12.  She argues that the psychological consultative examiner indicated substantial impairments in concentration, persistence, and pace, but that the language used in the hypothetical posed to the VE did not account for these impairments and, therefore, was faulty.  *Plaintiff's Brief* at 13.

A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments.  *Varley v. Commissioner of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987).  While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question . . . should include an accurate portrayal of [a claimant's] individual physical and mental impairments."  *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir. 2004).  Moderate deficiencies in CPP suggest substantial limitations which must be

-16-

acknowledged in the hypothetical question. *Edwards*, 383 F.Supp.2d at 931. If the hypothetical question is deficient, the ALJ cannot rely upon the VE's testimony to prove the existence of a substantial number of jobs that Plaintiff can perform in the national economy.[5] *Id*. at 927.

An ALJ is not required to include the phrase "moderate difficulties in concentration, persistence, and pace" or other specific language in the hypothetical. *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001); *Webb, supra*, 368 F.3d at 633. There is some divergence of opinion in this district as to what language sufficiently conveys moderate deficiencies with CPP. Cases from this district and elsewhere have held that language such as "unskilled work," or "simple work" are generally insufficient to account for moderate deficiencies in CPP. *See Edwards, supra*, 383 F.Supp.2d at 931; *Bankston v.* Commissioner, 127 F.Supp.2d 820, 826 (E.D.Mich. 2000); *Ealy v. Commissioner*, 594 F.3d 504, 516; *Newton v. Carter*, 92 F.3d 688, 695 (8th Cir. 1996). Other courts have held that limitations such as "one to two step tasks" or "simple routine tasks" in a hypothetical question adequately account for moderate

---

[5] An ALJ is "not required to solicit testimony for a VE in reaching his [Step Four] conclusion" that a particular claimant can return to her past relevant work. *Wright-Hines v. Commissioner of Social Sec.*, 597 F.3d 392, 395 (6th Cir. 2010). *See* 20 C.F.R. § 404.1560(b)(2) ("We *may* use the services of vocational experts . . . to help us determine whether you can do your past relevant work[.]") (emphasis added); *see also Griffeth v. Commissioner of Social Sec.*, 217 F.App'x 425, 429 (6th Cir. 2007) ("The regulations *permit* an ALJ to use the services of a vocational expert to use at step four to determined whether a claimant can do his past relevant work, given his RFC.") (emphasis added). However, if the ALJ uses the VE's testimony to conclude that the claimant can perform her past relevant work, material deficiencies in the hypothetical question would constitute reversible error consistent with a Step Five determination. *Badour v. Commissioner of Social Sec.*, 2011 WL 3320872, *7, n.5 ( E.D. Mich. July 18, 2011).

-17-

limitations in CPP. *See Lewicki v. Commissioner of Social Sec.*, 2010 WL 3905375, *2 (E.D. Mich. Sept. 30, 2010) and *Sutherlin v. Commissioner of Social Sec.*, 2011 WL 500212, *3 (E.D. Mich. February 8, 2011).

In *Edwards, supra*, the Court held that although the ALJ found that the Plaintiff had moderate deficiencies with CPP, the hypothetical question, limiting interaction with others and calling for "jobs entailing no more than simple, routine, unskilled" work did not convey those deficiencies to the VE. The Court concluded that the hypothetical question did not address whether the "[p]laintiff may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." *Edwards, supra*, 383 F.Supp.2d at 930-931.

Here, the ALJ's hypothetical to the VE called for him to consider a worker "having the ability to *understand, remember and carry out simple instructions and perform simple tasks*. Work that does not involve computation or calculation, and no more than occasional interaction with the public or coworkers." (Tr. 69)(emphasis added). This is not *per se* insufficient to account for moderate deficiencies with CPP. However, the record shows that Plaintiff's difficulties with CPP directly affected her ability to follow through to the completion of tasks. (Tr. 80, 93, 96-98). As such, these modifiers are insufficient to convey Plaintiff's moderate difficulties with CPP, *i.e.*, staying on task for an entire work shift, the timely completion of tasks, maintaining focus, or other workplace limitations. Having found that Plaintiff suffered moderate deficiencies in CPP, the ALJ was required to include these limitations in the hypothetical question. *Id*. at 929. In the ALJ's second hypothetical

question to the VE, she included the limitation of "not being able to sustain an ordinary routine without special supervision on a frequent basis," along with others, and the VE said that a person would be precluded for sustainable employment. (Tr. 71). A review of the VE's job findings indicate that the question's deficiencies were not harmless error.

Two of the three past relevant work positions the ALJ found Plaintiff capable of performing, equipment cleaner and fast food worker, require the worker to maintain a steady pace throughout the day. For example, the Plaintiff described her work as an "equipment cleaner" as "cleaning parts [in a bucket of water]. . . so they can go through a sprayer, [to] be painted." (Tr. 63). Likewise, assembly line work generally requires the ability to maintain a consistent rate of speed. Additionally, it would seem that a fast-food worker would need to maintain a constant high-speed pace in order to fulfill the requirements of the position.[6] The VE's job findings were given in response to an inadequate hypothetical question, and cannot act as substantial evidence to support to ALJ's decision. *Teverbaugh v. Commissioner of Social Sec.*, 258 F.Supp.2d 702, 706 (E.D. Mich. 2003).

As such, the deficient hypothetical in this case requires remand for further clarification. The ALJ relied upon the VE's testimony when she found that Plaintiff could return to her past relevant employment as a fast-food worker, dishwasher, and equipment cleaner. Thus, it was important for the VE to be aware of Plaintiff's moderate deficiencies

---

[6] Moreover, to the extent that fast-food work entails contact with the public, it would be similar to Plaintiff's former employment as a grocery bagger or deli restaurant worker, jobs that the VE testified she would be unable to perform due to "frequent contact with the public." (Tr. 69).

in CPP before he concluded that Plaintiff was able to perform her past relevant work.

**B.  The ALJ's Rejection of Plaintiff's Credibility**

Next, Plaintiff argues that the ALJ did not provide sufficient reasons for discounting her testimony and finding a lack of credibility.  *Plaintiff's Brief*, at 13.  Plaintiff faults the ALJ for dismissing her credibility with nothing more than a conclusory statement, contending that the ALJ failed to comply with the requirements of Social Security Ruling[7] ("SSR") 96-7p.  *Id*.

The credibility determination, guided by SSR 96-7p, is a two-step process for evaluating symptoms.  *See also Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment . . . that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  *Id.*  Second, SSR 96-7p, directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire case record."  20 C.F.R. § 404.1529(c)(3) lists the factors to be considered in making

_____

[7] SSR's "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency. 20 C.F.R. § 402.35(b)(1). While SSR's do not have the force of law, they are an agency's interpretation of its own regulations and "entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation." *Kornecky v. Commissioner of Social Security*, 167 Fed.Appx. 496, 498 (6th Cir. 2006), quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 549 (6th Cir.2004) (citations omitted).

a credibility determination, including daily activities, "precipitating and aggravating factors," treatment received for relief of symptoms, and additional considerations relevant to functional limitations. 20 C.F.R. § 404.1529(c)(3).

"[S]ubjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record." *Jones v. Commissioner*, 336 F.3d 469, 475 (6th Cir. 2003) (citing *Young v. Secretary of HHS*, 925 F.2d 146, 150-51 (6th Cir. 1990)). When assessing the Claimant's alleged impairments, the "ALJ may properly consider the credibility of a claimant when making a determination of disability." *Id*. 476 (*citing Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ's credibility determination is entitled to great weight, but it must be supported by substantial evidence. *Id*. at 531.

First, the ALJ's conclusion that Plaintiff's testimony concerning the intensity, persistence and debilitating effects of her physical impairments were less than fully credible is well supported and explained. Specifically, the ALJ noted that the record contains no objective imaging or other medical evidence to support the allegation of ongoing joint degeneration, soft tissue injury, or spinal pathology. (Tr. 19). She also noted the lack of evidence concerning Plaintiff's alleged wrist or knee impairments. (Tr. 19). The ALJ highlighted Dr. Gause's May 2011 consultative examination notes which make no mention of a physical restriction aside from Plaintiff's own allegations. (Tr. 358-363). Additionally, the ALJ noted Plaintiff's lack of wrist and knee complaints in her treating physician's records. (Tr. 19). The ALJ also pointed to Plaintiff's testimony that she never took pain

-21-

medication, and the lack of evidence that she was unable to complete her daily household responsibilities.  (Tr. 19).

Second, ALJ's decision to reject Plaintiff's credibility concerning the impact of her mental impairments on her ability to find gainful employment was also well supported by the record.  The ALJ noted substantial gaps between psychological treatments and Plaintiff's unwillingness to comply with her prescribed medication regime.  (Tr. 19).  Also, the ALJ pointed to the fact that Plaintiff has never displayed any behavior to her treating mental health professionals that have caused them to recommend extended inpatient psychiatric care and evaluation.  (Tr. 19).  The ALJ recognized Plaintiff's difficulties with performing serial sevens and other tasks on the mental status examination, but concluded that these difficulties would not affect the Plaintiff's ability to perform the work described in the RFC.  (Tr. 20).

Because there is no support for the argument that the ALJ performed an inadequate credibility analysis or applied the wrong legal standard, the deference generally accorded the administrative credibility finding is appropriate here.  *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230 (6th Cir. 1993); *Richardson, supra*, 402 U.S. at 401.  As such the ALJ's credibility determination should not be disturbed.

### C.  The Weight Afforded to Treating and Non-Treating Physicians

Plaintiff's Argument C and Argument I have been consolidated under one heading since both concern the weight given to the treating and non-treating sources.  Plaintiff cites *Hall v. Bowen*, 837 F.2d 272 (6th. Cir. 1988), where the Court of Appeals held that the Commissioner, and by extension an ALJ, may reject a treating physician's opinion only if

-22-

good reasons are identified for not accepting it.  *Plaintiff's Brief* at 17.  Citing *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987), Plaintiff appears to argue that the ALJ improperly chose the  opinion of Dr. Hill, the non-examining source, over the opinion of Dr. Caputo. *Id*. at 23.  However, the ALJ noted that Dr. Hill's opinion was based upon the entire available record and consistent with the RFC, and that Dr. Hill was knowledgeable of the disability program and its requirements.  (Tr. 21).  Further, aside from citations to the SSR and a few conclusory statements, Plaintiff does not support these arguments with any citation to the administrative record.   There is no discussion or reliance on anything from the ALJ's opinion to support the argument that the ALJ improperly weighed the treating examining and non-examining sources.  "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997).

Moreover, my own review of the record and the ALJ's opinion shows that the decision to adopt Dr. Hill's findings is well supported and explained.  (Tr. 51, 53, 308, 326, 353, 391). The ALJ stated that Dr. Caputo's opinion was qualified in vague terms and relied on Plaintiff's subjective complaints not consistent with the doctor's clinical findings.  (Tr. 21). There is no error in the treating physicians analysis.

### D.  SSR 96-8p

Plaintiff next argues that the administrative opinion did not contain a "function by function" analysis of her work-related mental ability as required by SSR 96-8p.  While she

cites the applicable regulations, she fails to state how this portion of the ALJ's analysis was deficient.

Moreover, as discussed above, the opinion contained thorough discussion of Plaintiff's mental impairments for the Residual Functional Capacity. (Tr. 18-22). There is no error here.

### E.  ALJ's Consideration of Plaintiff's GAF Scores

Plaintiff argues that the ALJ erred by discounting the import of her GAF scores. *Plaintiff's Brief* at 20.  Specifically, Plaintiff argues that the ALJ's failure to factor the GAF scores, ranging between 45 and 51, in the RFC requires remand.  *Id*.

A GAF score is "a subjective determination that represents the clinician's judgment of the individual's overal level of functioning.  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting oneself or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)."  *White v. Commissioner of Social Sec.*, 572 F.3d 372, 276 (6th Cir. 2009)(citing *Edwards v. Barnhart, supra*, 383 F.Supp.2d at 924 fn. 1 (E.D. Mich 2005)).  "A GAF score is thus not dispositive of anything in an of itself but rather only significant to the extent that it elucidates an individual's underlying mental issues. *Oliver v. Commissioner of Social Sec*. 415 Fed.Appx. 681, 684, 2011 WL 924688, *4 (6th Cir. March 17, 2011)(citing *White*, 572 F.3d at 284).   "'The GAF scale ... does not have a direct correlation to the severity requirements in [the regulations'] mental disorders listings.'" *Oliver*, at *4 (citing 65 Fed.Reg. 50746, 50764–65 (2000)).  See also *Kornecky v. Commissioner of Social Security, supra*, 167

Fed.Appx. at 511, 2006 WL 305648, *13 (6th Cir. February 9, 2006)(citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.2002))("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place").

The ALJ did not err in giving little weight to Plaintiff's GAF scores. She acknowledged the range of Plaintiff's GAF scores (45-51), but correctly noted that GAF scores are nothing more than "a subjective interpretation of how that particular provider perceives the claimant on that particular day, based upon various factors." (Tr. 20). She concluded that Plaintiff's GAF score had little probative value. (Tr. 21). Because the minimal weight accorded the score is well supported by Sixth Circuit case law and the reasons stated in the ALJ's opinion, a remand on this basis is unavailable.

### F.  SSR 96-9p and Plaintiff's Maximum Remaining Ability

Here, Plaintiff argues only that she "has been diagnosed with severe depression and greatly depressed functioning. These conditions in conjunction with her physical limitations clearly restrict her non-exertional abilities." *Plaintiff's Brief* at 20-21. However, this argument does not contain even one example of how her work-related abilities were affected by depression, much less how the ALJ erred. Plaintiff's two sentence argument that the ALJ did not abide by the requirements of SSR 96-9p, without further development, has no merit.

### G.  Substantial Evidence

Plaintiff argues that the ALJ erred by citing only the portions of the record supporting a non-disability finding. *Plaintiff's Brief* at 22-23. She contends that the ALJ's failure to

consider records supporting her disability claim mandates remand.  *Id*.

Under the deferential evidence standard, an ALJ need not support his findings with a preponderance of the evidence.  *Mullen, supra*, 800 F.2d at 545.  By the same token, "cherry picking" or disregarding favorable statements from a record that as a whole, demonstrate the need for long-term mental health intervention, amounts to a distortion of the record.   "'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record." *Laskowski v. Apfel*, 100 F.Supp.2d 474, 482 (E.D.Mich.2000) (Roberts, J.) ( citing *Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir.1981).  Likewise,"[s]ubstantial evidence cannot be based on fragments of the record." *Laskowski*, 100 F.Supp. at 482.

Substantial evidence generously supports the ALJ's determination.  First, the only mention of suicide attempts in the record are Plaintiff's own claims to treating and non-treating sources.  (Tr. 326, 364, 390).  Further, the sources believed that Plaintiff did not pose a risk to herself or to others.  (Tr. 326, 390).  The sources opined that Plaintiff's description of her condition did not appear to be true auditory or visual hallucinations, but instead were grief responses.  (Tr. 325, 391).

Further, Plaintiff's claim that the ALJ failed to consider records supporting the disability claim is without merit.  First, the ALJ mentioned Plaintiff's claims of suicidal thoughts, but noted that Plaintiff claimed "a 50 percent reduction in depression and suicidal thoughts with medication compliance" to Dr. Cherukuri.  (Tr. 17).  Second, the ALJ discussed Plaintiff's claim of social anxiety and an inability to control her temper, (Tr. 16),

but found only moderate limitations based on Plaintiff's claims that she was able to get along with others (Tr. 16) and treating and non-treating health professionals observations that Plaintiff had no difficulty with anger or establishing rapport.  (Tr. 16-17).

There is no merit to this issue.

## H.  ALJ's Consideration of Plaintiff's Obesity

Plaintiff's final argument is that the ALJ failed to properly consider the impact of her obesity in making her determination.  Specifically, Plaintiff argues that the ALJ erred by not examining the effects of her disability as thoroughly as is required by SSR 02-1p.

SSR 02-1p classifies individuals with a Body Mass Index (BMI) greater to or equal to 30.0 as "obese."  When determining the impact upon an individual's ability to function, "*Social Security Ruling* 02-1p does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation."  *Nejat v. Commissioner of Social Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. 2009) (citation and internal quotation marks omitted).  The Commissioner must conduct an individualized assessment of the impact of the claimant's obesity on his or her functional abilities.  *SSR 02-1p*.

The ALJ's finding that the Plaintiff's obesity did not cause or contribute to a functional limitation inconsistent with the RFC is supported by substantial evidence.  In her opinion, the ALJ noted that Plaintiff told Dr. Caputo that she was able to perform all household chores and self-care activities independently.  (Tr. 16).  Additionally, the ALJ highlighted the Third-Party Function Report, signed by William Kaiser, but completed by

both Mr. Kaiser and Plaintiff, which indicated that Plaintiff was able to walk for five miles before she needed a rest.  (Tr. 21).

Plaintiff's argument that the ALJ failed to give adequate consideration to Plaintiff's obesity is unpersuasive.  Plaintiff does not point to any evidence that would suggest that the ALJ failed to properly consider the effect of Plaintiff's obesity on her ability to function.  Additionally, Plaintiff does not alleged a failure to adequately develop the record regarding the effect of her obesity.

In conclusion, the failure to account for Plaintiff's moderate deficiencies with CPP warrants a remand for additional vocational testimony.  Notwithstanding these errors, the present transcript does not establish an "overwhelming" case for disability.  *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171 (6th Cir. 1994).  As such, the errors discussed herein, while critical, do not automatically entitle the Plaintiff to an award of benefits.  *Id*.  Accordingly, the case should be remanded to the administrative level for further proceedings consistent with this Recommendation.

## **CONCLUSION**

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Doc. #16] be DENIED, and that Plaintiff's Motion for Summary Judgment [Doc. #11] be GRANTED to the extent that the case be remanded for further administrative proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1

(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 425 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6oth Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificty will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

**s/ R. Steven Whalen** _____
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: April 29, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on April 29, 2013.

s/Johnetta M. Curry-Williams _____
Case Manager